IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DOMINIC VARGAS and ANNE HICKOK, )
  on behalf of themselves and )
  all others similarly situated, )
                                         )
      Plaintiffs, )
                                         )
        vs. )    Civil Action No. 10-867
                                         )
GENERAL NUTRITION CENTERS, INC., )
  and GENERAL NUTRITION CORP., )
                                         )
      Defendants. )

**MEMORANDUM OPINION**

Pending before the Court is a motion by General Nutrition Centers, Inc., and General Nutrition Corp. (collectively, "GNC"), seeking to dismiss Count II of the First Amended Complaint filed by Plaintiffs Dominic Vargas and Anne Hickok. (Doc. No. 15.) For the reasons discussed below, Defendants' motion is granted.

**I.   BACKGROUND**

    A.   Factual Background[1]

Defendants maintain a chain of some 2,800 stores in the United States where they sell health and wellness products such as vitamins and herbal supplements. Plaintiff Dominic

---

[1] The facts in this section are taken from the Amended Complaint, Doc. No. 14.

Vargas worked for GNC for approximately four years. From May 2008 until January 2010, Mr. Vargas was the Manager of a GNC outlet in a suburb of Pittsburgh, Pennsylvania. Anne Hickok, a resident of Greensboro, North Carolina, was employed between April 2007 and February 2009 as a Manager of a GNC store in that area. In GNC's employment hierarchy, store Managers are classified as "non-exempt" employees.[2]

Like other GNC store Managers, Ms. Hickok and Mr. Vargas were required to perform a variety of duties, including customer sales, inventory, recordkeeping, and store maintenance. They and other GNC employees recorded the time they worked by using a centralized computer system known as the "Point of Sales" or POS system which Defendants managed via cash registers in each store. GNC store Managers reported to a Senior Store Manager ("SSM") who was responsible for approximately four outlets and to a Regional Sales Director ("RSD") who in turn supervised a number of SSMs. Both SSMs and RSDs monitored the amount of base and overtime work hours recorded by each store's employees.

---

[2] Under the Fair Labor Standards Act, employees are generally entitled to overtime for work performed in excess of 40 hours per week. 29 U.S.C. § 207(a). However, employees may be classified as "exempt" from the FLSA overtime provisions if certain criteria concerning salary, levels of responsibility, and other aspects of their jobs show that they are employed "in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a). By default, any employee who is not in one of those three categories is referred to as "non-exempt." The fact that Plaintiffs were considered "Managers" is irrelevant because a job title alone is insufficient to establish whether an employee is exempt or non-exempt. 29 C.F.R. § 541.2.

2

GNC policies "tended to encourage" off-the-clock work by their employees. (First Amended Complaint, Doc. No. 14, "Am. Compl.," ¶ 20.) For example, Managers were not permitted to allow other employees to exceed the number of working hours budgeted for the store and if part-time or clerical employees could not complete the necessary work within the time allotted, the Manager was expected to perform the work without incurring overtime. If a Manager failed to remain within the budgeted hours for his or her store, the Manager would be publicly criticized ("called out") during weekly management conference calls or would receive a telephone call from the SSM or RSD reprimanding him for exceeding the clerical hours budgeted.

According to Plaintiffs, Managers could not complete the assigned work within the forty hours per week for which they were paid and consequently were expected to complete their work "off-the-clock." In order to recoup some of the unpaid time, Managers would make adjusting time entries through the POS system, a practice that was known and, in fact, recommended by GNC supervisors. For example, Mr. Vargas alleges he received "informal training" from other managers and SSMs regarding this practice and was told that he should also use this method to account for time spent on GNC business when not actually present at the store such as during the weekly management conference calls. These adjusting entries could be easily identified in

3

the POS system because they appeared with an asterisk.

Notwithstanding the fact that SSMs and RSDs knew of the practice and in fact encouraged it, upper level management at GNC took "firm enforcement action" against employees who made adjusting entries or were believed to have encouraged others to make such entries. This included Mr. Vargas and Ms. Hickok. In January 2010, GNC conducted an investigation which resulted in Mr. Vargas's employment being terminated because he had "stolen time" from GNC by making adjusting entries. Ms. Hickok was forced to resign in 2009 because she had allegedly signed-off on similar entries made by a part-time employee.

B. <u>Procedural History</u>

Plaintiffs filed suit in this Court on June 29, 2010, alleging that the practices of GNC requiring former and current Managers, Assistant Managers and other non-exempt employees to work off-the-clock without being paid at overtime rates violated the Fair Labor Standards Act, as amended, 29 U.S.C. § 201 *et seq.* ("FLSA.") Count I of the initial complaint sought overtime pay for work in excess of forty hours per week which GNC had willfully refused to pay through its policy of requiring management employees to work on off-the-clock. Count II alleged that Mr. Vargas, Ms. Hickok, and other current or former GNC management employees who had made adjusting time entries were discriminated against in that they were discharged or forced to

4

resign when they complained about the policy or took other steps to enforce their rights to overtime compensation under the FLSA.

Defendants filed a motion to dismiss Count II of the complaint on September 9, 2010 (Doc. No. 6), arguing that Plaintiffs had failed to allege the necessary elements of a claim of discrimination under the FLSA inasmuch as they did not identify any GNC employee, including the named Plaintiffs, who had ever complained about GNC's pay practices or about the time recording system.

Plaintiffs responded by filing the First Amended Complaint, and Defendants again filed a motion to dismiss Count II pursuant to Federal Rule of Civil Procedure 12(b)(6) for the same reasons as previously stated. GNC argues that despite amending their complaint, Plaintiffs still have failed to identify any protected activity that could support a retaliation claim. Thus Count II fails as a matter of law under the pleading standards established by Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

## II. JURISDICTION AND VENUE

This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1337 and 29 U.S.C. § 216(b). Venue is appropriate in this District inasmuch as Defendants are headquartered and therefore reside in this district. 28 U.S.C.

§ 1391(b).

**III. STANDARD OF REVIEW**

Federal Rule of Civil Procedure 8(a) requires that a pleading which "states a claim for relief must contain. . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief." The Rule further provides that "[e]ach allegation must be simple, concise, and direct" but "[n]o technical form is required." Fed. R. Civ. P. 8(d). "The touchstone of Rule 8(a)(2) is whether a complaint's statement of facts is adequate to suggest an entitlement to relief under the legal theory invoked and thereby put the defendant on notice of the nature of the plaintiff's claim." In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 320, n.18 (3d Cir. 2010) ("Brokerage Antitrust"), citing Twombly, 550 U.S. at 565, n.10.

In the aftermath of Twombly, Iqbal, and the interpretation of those two cases by the United States Court of the Appeals for the Third Circuit, the pleading standards which allow a complaint to withstand a motion to dismiss pursuant to Rule 12(b)(6) have taken on slightly new parameters. The standard is now whether the complaint includes "sufficient factual matter to show that the claim is facially plausible." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009); see also Twombly, 550 U.S. at 555, holding that a complaint which offers only "labels and conclusions" or "a formulaic recitation of the

6

elements of a cause of action will not do." The Fowler court further directed that in considering a motion to dismiss, the district court should undertake a two-part analysis:

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to show such an entitlement with its facts. As the Supreme Court instructed in Iqbal, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not shown - that the pleader is entitled to relief."

Fowler, 578 F.3d at 210-211 (quotations and citations omitted.)

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949; *see also* Gelman v. State Farm Mut. Auto. Ins. Co., 583 F.3d 187, 190 (3d Cir. 2009), and Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010). "Determining whether a complaint states a plausible claim for relief will. . .be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Brokerage Antitrust, 618 F.3d at 361, *quoting* Iqbal, 129 S. Ct. at 1950. A complaint should not be dismissed even if it seems unlikely the plaintiff can prove the facts alleged in

7

the complaint or will ultimately prevail on the merits. The Twombly pleading standard "does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." McTernan v. City of York, 564 F.3d 636, 646 (3d Cir. 2009) (internal quotations omitted.)

**IV. DISCUSSION**

    A.  <u>FLSA Law Pertaining to Claims of Retaliation</u>

The FLSA includes an anti-retaliation provision that makes it unlawful for an employer[3]

> to discharge or in any other manner discriminate against an employee because such employee has filed any complaint or instituted or caused to being instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3).

To survive a motion to dismiss a claim of unlawful discriminatory retaliation under the FLSA, the employee must plead the elements of such a claim: (1) he engaged in a protected activity, i.e., one of those listed in Section 215(a)(3) (or the employer erroneously believed he had engaged in such activity); (2) the employer took adverse action against

---

[3] Neither Defendant argues that it is not an "employer" subject to the overtime provisions of the FLSA. See 29 U.S.C. §§ 203(d) and 207(a)(1).

8

him either contemporaneously with or subsequent to the protected activity; and (3) a causal connection existed between the activity and the employer's action. Wildi v. Alle-Kiski Med. Ctr., 659 F. Supp.2d 640, 664 (W.D. Pa. 2009).

As part of the "humanitarian and remedial legislation" enacted by Congress to protect the rights of workers, the FLSA is to be "liberally interpreted." Brock v. Richardson, 812 F.2d 121, 123 (3d Cir. 1987), *citing* Tennessee Coal, Iron & Railroad Co. v. Muscoda Local No. 123, 321 U.S. 590, 597 (1944) (the statute "must not be interpreted or applied in a narrow, grudging manner.") In particular, "the anti-retaliation provision was designed to encourage employees to report suspected wage and hour violations by their employers" and to prevent employees' "fear of economic retaliation" when they did so. Brock, id. at 124, *quoting* Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 293 (1960) (other internal citations omitted); *see also* Chennisi v. Communs. Constr. Group, LLC, CA No. 04-4826, 2005 U.S. Dist. LEXIS 2274, *6 (E.D. Pa. Feb. 17, 2005) (applying the anti-retaliation provision broadly enough to include internal complaints to an employer regarding FLSA violations as protected activity), and Wildi, id. (same.)

B. Analysis

Defendants argue that Plaintiffs have failed to state a claim for retaliation in violation of the FLSA because there

9

are no allegations in the Amended Complaint that they filed a complaint with GNC management about being required to work off-the-clock and/or without overtime compensation. In fact, according to GNC, there are no allegations regarding any type of communication between Plaintiffs and their employer concerning Defendants' pay policies. Consequently, Count II fails as a matter of law and must be dismissed. (Defendants' Memorandum in Support of Motion to Dismiss, Doc. No. 16, at 6-8.) Moreover, although this omission was pointed out to Plaintiffs in the motion to dismiss the initial complaint, it has not been corrected in the Amended Complaint, even though several speculative and/or conclusory allegations about what GNC upper management knew or perceived have been added. Such allegations do not withstand scrutiny under the standard established in Iqbal, another reason Count II must be dismissed. (Id. at 8-10.)

Plaintiffs respond that they have satisfied the criteria of Twombly and Iqbal in the Amended Complaint, but Defendants have ignored numerous points where they have referred to complaints they raised about GNC's off-the-clock practices. (Plaintiffs' Brief in Opposition to Defendants Motion to Dismiss Count II of the First Amended Representative Complaint, Doc. No. 19.)

In the Amended Complaint, Plaintiffs do not allege that either of them "instituted or caused to being instituted" any

FLSA proceeding, "has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." By default, therefore, the only protected action which would trigger an FLSA claim of retaliation is for them to have "filed [a] complaint" about GNC's allegedly illegal pay practices. However, there is no allegation that either Plaintiff filed such a complaint with, for instance, an external agency such as the Wage and Hour Division of the United States Department of Labor; therefore, again by default, the complaint could only have been made internally to GNC management. Defendants contend that nothing in the Amended Complaint identifies any formal or informal communication from a Plaintiff to any member of GNC management which would be deemed a "complaint" in the common sense of the word.

Plaintiffs argue that there are numerous references in the Amended Complaint to instances where they complained to GNC management about the no-overtime policy. These complaints took the form of making adjusting time entries. That is, when they increased the number of hours reported in the POS system for one time period by the number of unpaid overtime hours worked in a previous time period, either for themselves (in the case of Mr. Vargas) or for subordinate employees (in the case of Ms. Hickok), Plaintiffs were communicating their objections to the company policy of not paying overtime to non-exempt employees.

11

These allegations in the Amended Complaint include the following (emphasis added by the Court):

- The adjusting entries to compensate for unpaid hours worked were made "openly" and marked with an asterisk which would have made it "**immediately apparent** to GNC management" that Mr. Vargas "**regularly asserted** his right to compensation for off-the-clock work." (¶ 28.)

- By making the adjusting time entries, Mr. Vargas was **stating his position** that he was entitled to compensation for all hours worked, **affirmatively refusing** to forego overtime compensation, and **openly conveying** these beliefs to GNC management. (¶ 30.)

- Although upper management at GNC knew of, and to some extent condoned, the practice, they also "**perceived** these adjusting entries as an effort by the employees. . . to **assert the right to compensation** for overtime hours worked off the clock [and] **as a direct challenge**" **to GNC's policies** regarding unpaid overtime and working off-the-clock. (¶ 35.)

- "In response to this **perceived challenge** to GNC's no-overtime policy, the upper levels of GNC's management undertook to make disciplinary examples out of Vargas and Hickok." (¶ 36.)

- Upper management "**perceived** Hickok's action in signing-off on adjusted (though legitimate) time entries [on behalf of another employee] **as a direct challenge** to GNC's" illegal labor practices. (¶ 37.)

- Upper management "**perceived** the adjusted time entries. . . **as a form of expressive conduct** by the employees. GNC **knew and understood** that employees who made such entries were **asserting**" **their objections** to GNC's illegal practices and **asserting** "**that they were unwilling**" to forego their entitlement to overtime pay. (¶ 47.)

- Making adjusted time entries "**came to be viewed,** by GNC's upper management, **as an assertion** by the employees. . .that they had in fact worked uncompensated overtime, that they were entitled to compensation for such work, and that GNC's no overtime

12

policy was. . .illegal" under the FLSA. (¶ 49.)

- The practice was "**understood or perceived** by GNC's upper management to be **a form of complaint**" about the no-overtime policy. (¶ 50.)

- "GNC **came to view or perceived**" these entries "as a **form of complaint or the assertion of rights** by the employee" to overtime compensation. (¶ 51.)

- By making the adjusting time entries, Mr. Vargas "had **given requisite notice to GNC of his intention to pursue or at least assert his rights**" to uncompensated overtime. Thus, "**within the meaning of the statute he had filed a complaint or otherwise complained to GNC**" about their unlawful labor practices. (¶ 52.)

- GNC management "**perceived Hickok's conduct as amounting to a complaint and/or challenge**" to GNC's unlawful labor practices. (¶ 53.)

- By terminating Plaintiffs' employment, GNC discriminated against them "based on **their actual or perceived expressive conduct** in opposing GNC's overtime policies by means of actual or perceived participation in the making of adjusting time entries." (¶ 54.)

On the other hand, Plaintiffs also allege that in response to the no-overtime policy, the practice of making adjusting time entries "was approved and, in fact, recommended by various members of the levels of GNS's management that directly supervised Plaintiffs and other members of GNC's workforce." (Am. Compl., ¶ 25.) As noted above, Mr. Vargas further alleges that he received "informal training from several managers and SSMs" about this practice. (Id., ¶ 26.) In short, Plaintiffs would have us believe several internally inconsistent facts: local supervisors directed store Managers to make "compensating"

13

(or, viewed less kindly, false) time entries as a means of evading the company's no-overtime policy; upper management knew of this practice and condoned it because it facilitated their illegal policies; yet, when Mr. Vargas and Ms. Hickok engaged in this practice, upper management "perceived" their actions as a "direct challenge" to the no-overtime policy and fired them.

Plaintiffs do not explain how making an adjusting time entry can deemed simultaneously as (1) following the instructions of lower level managers and (2) voicing a complaint to upper management about the no-overtime policy. Nor do they explain how they learned that upper management "perceived," "viewed," or "understood" the adjusting time entries to be a "complaint" about the policy. Since there are no allegations concerning contacts between either Plaintiff and any member of "upper management," except for the inference that someone in upper management initiated their terminations, what GNC management "perceived" or "understood" is nothing more than speculation on the part of Ms. Hickok and Mr. Vargas.

By a curious coincidence, a non-precedential opinion has just been issued in a case where the plaintiff, like Mr. Vargas and Ms. Hickok, alleged that submitting a time card in which she reported overtime hours constituted an FLSA "complaint" giving rise to retaliation. In Ritchie v. St. Louis Jewish Light, No. 10-1356, 2011 U.S. App. LEXIS 50 (8th Cir. Jan. 4, 2011), Lisa

14

Ritchie alleged that she had been told to work overtime without recording those hours. Contrary to those instructions, she reported the overtime. Despite a reprimand from her supervisor, Larry Levin, Ritchie persisted in recording the overtime hours and was fired. Id. at *1-*3. When she sued Jewish Light for retaliation, she argued that by recording the overtime she had worked, she had given "Levin notice that she believed Levin's instructions were a violation of the law." Id. at *6. The Eighth Circuit Court of Appeals first noted that like that of the Third Circuit, it had never explicitly decided the question of whether an informal complaint to a supervisor (as compared to an outside agency) was sufficient to trigger the anti-retaliation provision of the FLSA. However, the Court reasoned it did not need to address that question because recording the overtime contrary to Levin's instructions was not a "complaint" but rather only insubordination. For example, if "merely recording one's overtime [were] a 'complaint' that triggers the anti-retaliation provision of the FLSA, an employer would not be able to discipline an employee for working unauthorized overtime so long as the employee recorded the overtime." Ritchie, 2011 U.S. App. LEXIS 50 at *6. Therefore, applying the plausibility standard of Iqbal, the Court determined that the district court had properly dismissed the retaliation claim because Ritchie had pleaded facts which did no more than raise "the mere possibility

of misconduct." Id. at *7.

Here, it is evident from the allegations that Mr. Vargas was "informally trained" by his immediate supervisors that the way to receive *some* compensation for overtime work (even if not at the statutorily-mandated rate of 1.5 times the regular rate of pay) was to make an adjusting entry the following pay period. Plaintiffs complied with this practice, apparently without objection, and never overtly complained about it to anyone in GNC management. Like the Court of Appeals in Ritchie, we do not view Plaintiffs' actions as an "affirmative complaint" but rather a post-hoc rationale devised to create a claim of retaliation. As in Ritchie, this Court does not condone the employer's underlying practices,[4] but finds that an employee's "self-help" method to accomplish the goal of being compensated for all time worked does not constitute a "complaint" as that word is commonly understood.

Plaintiffs do not cite, and independent research has failed to disclose, any reported federal case in which the court has found that the concept of "complaint" encompasses anything other than a formal or informal, written or oral, statement of

---

[4] One distinction between this case and Ritchie is that the plaintiff there was paid at the correct overtime rate for all hours worked and her complaint was based only on retaliation. See Ritchie v. St. Louis Jewish Light, CA No. 09-1947, 2010 U.S. Dist. LEXIS 10579 (E.D. Mo. Feb. 8, 2010). Here, Plaintiffs do not allege that they were not paid at their regular rate of pay for all hours reported through the adjusting entries, only that they were denied overtime.

16

objection by an employee to an employer about the latter's labor practices.[5]  Although mindful of the admonition in <u>Brock v. Richardson</u> that a court should respect the "animating spirit" of the FLSA in determining if "activities that might not have been explicitly covered by" the anti-retaliation provision should be deemed complaints, we are still convinced that some overt form of protest is required to establish a "complaint" as contemplated by the statute.  Even those courts that have recognized informal communications with employers as complaints have noted that "not all amorphous expressions of discontent" constitute complaints within the meaning of the statute.  As the Ninth Circuit Court of Appeals has held, "in order to find protection under § 215(a)(3), an employee must actually communicate a complaint to the employer," meaning he must have communicated the "substance of his allegations to the employer,"

---

[5] Plaintiffs rely on the case of <u>Wilke v. Salamone</u>, 404 F. Supp.2d 1040 (N.D. Ill. 2005), for the proposition that expressive conduct even in the absence of a verbal or written complaint will establish the protected activity necessary for an FLSA retaliation claim. (Plaintiffs' Brief, Doc. No. 19, at 12-13.)  <u>Wilke</u> is distinguishable in that the plaintiffs in that case, after being told by their supervisor that they would have to re-do purportedly substandard work "on their own time," contacted their foreman, Turner, "and informed him they would not work for free;" in fact, four of the five plaintiffs expressed this position to Turner even though they had been told that if they did not do so, they would be terminated.  <u>Id.</u> at 1044.  They did not re-do the work and were fired.  The Court concluded that the employees' refusal to work for free was an expression of their right to be paid and constituted a protected activity.  <u>Id.</u> at 1048.  As noted in the text above, there are no allegations in the Amended Complaint that either Plaintiff ever expressed directly to his or her supervisor any objection to the practice of making adjusting time entries in lieu of being paid overtime.

17

including some intimation, at least, that the practice is illegal. Lambert v. Ackerley, 180 F.3d 997, 1007-1008 (9th Cir. 1999) (*en banc*); *see also* Hardwick v. Complete Skycap Servs., No. 05-16422, 2007 U.S. App. LEXIS 17173, *4 (9th Cir. July 11, 2007) (complaints about salaries and tipping system without suggestions that the employer had violated the law in any way did not constitute complaints within the meaning of the statute); Valerio v. Putnam Assocs., Inc., 173 F.3d 35, 44-45 (1st Cir. 1999) ("abstract grumblings," i.e., "concerns and comments [that] are too generalized and informal to constitute 'complaints'" will not suffice); and Stubbs v. Ford Motor Co., CA No. 05-923, 2008 U.S. Dist. LEXIS 25459, *18-*20 (W.D. Mo. Mar. 31, 2008) (e-mail communications to management complaining about a change in overtime policies which did not allege that the change was illegal or violated the FLSA were not protected conduct.)

We also agree with the reasoning of the court in Hernandez v. City Wide Insulation of Madison, Inc., 508 F. Supp.2d 682, 691, n.3 (E.D. Wis. 2007), where the list of complaints employees had made about a variety of wage issues included the fact that they had refused to sign pay sheets they believed to be inaccurate. The court noted it would accept this allegation as a form of complaint "to the extent plaintiffs accompanied their actions with an explanatory statement." Here, however,

Plaintiffs do not allege that at any time, even after they were threatened with dismissal for making the adjusting time entries, that they explained to their supervisors that they had done so as a protest to the company's policies.

Plaintiffs' allegations about what upper management "perceived" and "understood" when they learned of the adjusting time entries set out an intriguing theory, but nothing more. The numerous allegations that upper management perceived, understood or viewed the adjusting entries as complaints about the no-overtime policy are nothing more than "naked assertions" devoid of further factual enhancement. Iqbal, 129 S. Ct. at 1949. With respect to such speculative allegations, the Supreme Court has noted, "We do not reject these bald allegations on the ground that they are unrealistic or nonsensical. . . .It is the conclusory nature of [such] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth." Iqbal, 129 S. Ct. at 1950-1951. Without factual allegations of overt complaints to GNC management about the company's overtime policies, the claim of retaliation must fail and Count II be dismissed.

An appropriate Order follows.

January __6__, 2011

                                                        _/s/ William L. Standish_
                                                      William L. Standish
                                                    United States District Judge