**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DOMINIC VARGAS, ANNE HICKOK** *on behalf of themselves and all others similarly situated*, | ) | **2:10-cv-867** |
| **Plaintiffs,** | ) | |
| **v** | ) | |
| **GENERAL NUTRITION CENTERS, INC.** *A Delaware Corporation and* **GENERAL NUTRITION CORPORATION,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER OF COURT**

Now pending before the Court is PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION, Doc. No. 53, with brief in support, Doc. No, 57, and an appendix comprised of numerous volumes of various records, documents, and transcripts filed in support of the motion, Doc. Nos. 72, 79 – 94, as well as DEFENDANTS' OPPOSITION TO MOTION FOR CONDITIONAL CERTIFICATION, Doc. No. 60, along with an appendix, Doc. No. 61. On April 11, 2012, oral argument on the motion for conditional certification was held in open court.

Following the argument, other documents germane to the motion to conditionally certify the class were filed. On three separate occasions, Plaintiffs filed a written consent on behalf of individuals to opt into the class, *see* Doc. Nos. 75, 95, & 99. Related to those filings, Plaintiffs filed the MOTION FOR LEAVE TO FILE DECLARATION OF MATTHEW HARMENING UNDER SEAL, Doc. No. 76, the MOTION FOR LEAVE TO FILE DECLARATION OF DIETRICH BLICKENDERFER, Doc. No. 96, and the MOTION FOR LEAVE TO FILE DECLARATION OF DORIS BRINCEFIELD, Doc. No. 100. Defendants opposed two of the

motions, Doc. Nos. 77 & 97, and Plaintiffs replied to Defendants' briefs in opposition to those responses, Doc. Nos. 78 & 98. The Court subsequently granted the three motions for leave to file the declarations, Doc. Nos. 102 – 104, and said declarations have since been filed by Plaintiffs, Doc. Nos. 106 – 108.

The issues have been fully briefed and well argued on behalf of the parties and are ripe for disposition. For the reasons that follow, Plaintiffs' motion will be granted, albeit not to the complete extent sought.

## Background

Defendants General Nutrition Centers, Inc. ("GNCI") and General Nutrition Corporation ("GNC") operate a chain of approximately 2,800 stores in the United States in which they sell health and wellness products such as vitamins and herbal supplements. In terms of the relationship between the two Defendants, GNCI is the parent company, and is responsible for the promulgation of various policies, administrative and legal functions. GNC, the wholly owned subsidiary, is responsible for the retail sales aspect of the business. Plaintiff Dominic Vargas worked for GNC for approximately four years. From May 2008 until January 2010, he was the Manager of a GNC retail store in a suburb of Pittsburgh, Pennsylvania. Plaintiff Anne Hickok, a resident of Greensboro, North Carolina, was employed between April 2007 and February 2009 as a Manager of a GNC store in that area.

GNC is headed by the Executive Vice President of the company, who, in turn, reports to the Chief Executive Officer of GNCI. Under the Executive Vice President of GNC are a number of management levels, proceeding from Divisional Vice Presidents ("DVP"), to District Sales Directors ("DSD"), and Regional Sales Directors ("RSD"). RSDs supervise both Senior Store Managers ("SSM"), Managers, and Assistant Managers. The operations of GNC are divided into

three Divisions, each of which is headed by a DVP, and each Division is divided into three Districts, which are headed by DSDs. Districts are divided into many different Regions (in all, GNC has 109 Regions), which are managed by RSDs. The number of stores in a region can vary, but average 27 stores per region. In GNC's employment hierarchy, store Managers are classified as “non-exempt” employees.

GNC categorizes its stores based on sales volume using an identification scale of “A”, “B”, “C”, or “D”. Stores designated as “A” are high volume stores, and “D” are GNC’s lowest volume stores. From a staffing perspective, “A” stores are allocated a greater number of budgeted clerical hours, whereas “B”, “C” and “D” stores are allocated fewer budgeted hours. Employees are generally expected to complete the requirements associated with operating the store within the given allotments of time. According to Defendants, RSDs receive a total number of clerical (part-time sales associate) hours to use in a given month across all stores in their region. *See* Doc. No. 61, Decl. of RSD Jeffers, at ¶¶ 25 - 35. The RSD has the discretion to assign those hours to individual stores as he or she deems appropriate. *Id*. In turn, the managers allocate that allotment to assign the work schedule for their respective stores in advance of the workweek, and, at the end of the week, review the hours worked by store employees as part of the approval process for the Final Payroll Report, which is sent to the RSDs. Each GNC store also has part-time employees often referred to as clerical staff. The number of clerical staff and the number of hours they work varies from store to store. Regardless of the type of store, GNC expects its store Managers to control costs by effectively managing their staffing expenses. *Id*.

Like other GNC store Managers, Mr. Vargas and Ms. Hickok were required to perform a variety of duties, including customer sales, inventory, recordkeeping, and store maintenance. They and other GNC employees recorded the time they worked by using a centralized computer

system known as the "Point of Sales" or POS system which Defendants oversaw via cash registers in each store. GNC store Managers would report to a Senior Store Manager ("SSM") who was responsible for approximately four outlets and to a Regional Sales Director ("RSD") who in turn supervised a number of SSMs. Both SSMs and RSDs monitored the amount of base and overtime work hours recorded by employees at each store.

Plaintiffs allege that GNC policies "tended to encourage" off-the-clock work by their employees in that Managers were not permitted to allow employees to exceed the number of working hours budgeted for the store and if part-time or clerical employees could not complete the necessary work within the time allotted, the Manager was expected to perform the work without incurring overtime. If the Manager failed to remain within the budgeted hours for his or her store, the Manager would be publicly criticized ("called out") during weekly management conference calls or would receive a telephone call of reprimand from the SSM or RSD for exceeding the clerical hours budgeted.

According to Plaintiffs, store Managers often could not complete the assigned work within the forty hours per week for which they were paid and consequently were expected to complete their work "off-the-clock." In order to recoup some of the unpaid time, Managers would make adjusting time entries through the POS system, a practice that was known and, in fact, recommended by GNC supervisors. For example, Plaintiff Vargas alleges that he received "informal training" from other managers and SSMs regarding this practice and was told that he should also use this method to account for time spent on GNC business when not actually present at the store, such as during the weekly management conference calls. These adjusting time entries could easily be identified in the POS system because they appeared with an asterisk.

## Procedural History

Plaintiffs filed this suit on June 29, 2010, on behalf of themselves and all others similarly situated alleging that the practices of GNC which required former and current Managers, Assistant Managers and other non-exempt employees to work off-the-clock without being paid at overtime rates violated the Fair Labor Standards Act ("FLSA"), as amended, 29 U.S.C. § 201 *et seq.* Plaintiffs filed a First Amended Complaint on September 22, 2010. Doc. No. 14. Count I of the First Amended Complaint seeks overtime pay for work in excess of forty hours per week which GNC had willfully refused to pay through its unwritten policy of requiring management employees to work on off-the-clock. Count II alleges retaliatory dismissal in violation of FLSA § 15(a)(3). Defendants answered Count I of the First Amended Complaint, Doc. Nos. 17 & 18, and moved to dismiss Count II, Doc. No. 15. On January 6, 2011, the Court granted GNC's motion to dismiss Count II. Doc. No. 20.

The parties engaged in limited fact discovery pursuant to a case management plan in order to address the issue of conditional certification. During this phase, discovery was limited to stores in North Carolina and Pennsylvania. Plaintiffs now move for conditional certification of a collective class consisting of "all present or former managers, assistant managers, and other non-exempt employees of Defendants General Nutrition Centers, Inc. and/or General Nutrition Corporation (collectively "GNC") in the United States who, during the three years prior to the commencement of this action to the present, may have been affected by the *de facto* policy against overtime alleged in the First Amended Complaint." Doc. No. 53 at ¶ 4.

## Analysis

The FLSA requires employers to pay non-exempt employees as defined under the FLSA wages for all work performed on behalf of the employer and to pay overtime for work performed

in excess of forty (40) hours per week. 29 U.S.C. §§ 206 & 207. Plaintiffs' petition to proceed on their FLSA claims on a collective basis. Collective actions brought under the FLSA are governed by § 216(b), which provides for an opt-in procedure for plaintiffs who desire to be included in the litigation. 29 U.S.C. § 216(b). There are two requirements for potential plaintiffs to be included in the collective action: plaintiffs must (1) be "similarly situated" and (2) give written consent. *Id.* (stating that "[a]n action to recover the liability ... may be maintained ... by any one or more employees for and in behalf of himself or themselves and other employees similarly situated" and plaintiffs must "give[ ] [their] consent in writing to become such a party and such consent is filed in the court in which such action is brought"). However, as the United States Court of Appeals for the Third Circuit has noted, the "similarly situated" standard for employees to proceed collectively under the FLSA is not defined by the statute. *Symczyk v. Genesis Healthcare Corp.*, 656 F.3d 189, 192 (3d Cir.2011). Likewise, the FLSA also does not provide specific procedures by which potential plaintiffs may opt in, but the United States Supreme Court has held that "district courts have discretion, in appropriate cases, to implement [§ 216(b) ] ... by facilitating notice to potential plaintiffs." *Hoffmann–La Roche, Inc. v. Sperling*, 493 U.S. 165, 169, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989).[1] The Court also stated that "once a[ ] [FLSA] action is filed, the court has a managerial responsibility to oversee the joinder of additional parties to assure that the task is accomplished in an efficient and proper way." *Id.* at 171.

A. Conditional Certification

"In deciding whether a suit brought under § 216(b) may move forward as a collective action, courts typically employ a two-tiered analysis." *Symczyk*, 656 F.3d at 192. During the

---

1 *Hoffmann–La Roche* involved the Age Discrimination in Employment Act, 29 U.S.C. § 621 et. seq., which incorporates the collective-action provisions of the FLSA.

initial phase, which is conducted early in the litigation process when the court has minimal evidence, “the court makes a preliminary determination whether the employees enumerated in the complaint can be provisionally categorized as similarly situated to the named plaintiff.” *Id.* “[I]f the plaintiff carries her burden at this threshold stage, the court will ‘conditionally certify’ the collective action for the purposes of notice and pretrial discovery.” *Id.* “After discovery, and with the benefit of a much thicker record than it had at the notice stage, a court following this approach then makes a conclusive determination as to whether each plaintiff who has opted in to the collective action is in fact similarly situated to the named plaintiff.” *Id.* at 193 (internal quotation marks omitted). If the plaintiff carries his or her heavier burden during the second phase “the case may proceed to trial as a collective action.” *Id.*

At the first step of the inquiry, “the plaintiff ... [must] make a modest factual showing that the proposed recipients of opt-in notices are similarly situated.” *Id.* (internal quotation marks omitted). Under this standard, “a plaintiff must produce some evidence, beyond pure speculation, of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees.” *Id.* (internal quotation marks omitted). However, this remains a lenient burden. *Smith v. Sovereign Bancorp, Inc.*, No. 03–2420, 2003 U.S. Dist. LEXIS 21010, at *10 (E.D.Pa. Nov. 13, 2003); *see also*, *Stanislaw v. Erie Indemnity Co.*, No. 1:07-cv-1078, 2009 WL 426641 (W.D. Pa. 2009)(a plaintiff’s burden in proving that the prospective plaintiffs are similarly situated is relatively light). Further, the merits of a plaintiff's claims need not be evaluated in order for notice to be approved and disseminated. *Chabrier v. Wilmington Fin., Inc.*, No. 06–4176, 2006 U.S. Dist. LEXIS 90756, at *6 (E.D.Pa. Dec. 13, 2006) (*citing Aquilino v. Home Depot, Inc.*, No. 04–4100, 2006 U.S. Dist. LEXIS 66084, *5 (D.N.J. Sept. 6, 2006)).

The thrust of the Court's inquiry at this juncture—i.e., at the conditional certification stage—"is not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are 'similarly situated' under 29 U.S.C. § 216(B) with respect to their allegations that the law has been violated." *Young v. Cooper Cameron Corp.*, 229 F.R.D. 50, 54 (S.D.N.Y.2005) (*citing Krueger v. N.Y. Tel. Co.*, Civ. Nos. 93–178, 93–179, 1993 WL 276058, *2 (S.D.N.Y. July 21, 1993) ("[T]he Court need not evaluate the merits of plaintiff's claims in order to determine whether a 'similarly situated' group exists."); *see also Owens v. Bethlehem Mines Corp.*, 108 F.R.D. 207, 210–211 (S.D.W.Va.1985) ("[A]t this point the Plaintiff does not have to prove that there was a class of employees which was subjected to discrimination by [the defendant]. This ... is the ultimate question. The Plaintiff only has to show that a group of employees similarly situated to one another are claiming discrimination.") Although these cases are not controlling, they are entirely consistent with the Third Circuit's admonition that, "[d]uring the initial phase, the court makes a preliminary determination whether the employees enumerated in the complaint can be provisionally categorized as similarly situated to the named plaintiff." *Symczyk,* 656 F.3d at 192.

In sum, the analysis here is not directed to whether the Plaintiffs will succeed in their claim; rather, the purpose of the analysis is to "establish[ ] nothing more than the right of the plaintiffs to 'maintain' a collective action." *Sperling v. Hoffman–La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J.1988) ("Sperling II"). As such, under the "modest factual showing" standard, the movant must produce some evidence "of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees." *Id.* at 19.

This motion concerns only the conditional certification phase. Some limited discovery has been completed, and Plaintiffs supply portions of a number of depositions and various documents, including company-generated reports detailing expenses associated with overtime, as well as directives from high level company officials. Plaintiffs maintain that conditional certification of the collective class of managers, assistant managers, and associates employed by GNC is appropriate based upon a "contradictory" culture in which GNC has promulgated nominal written policies against off-the-clock work, but maintains a *de facto* policy that actually promotes such uncompensated work. In support thereof, Plaintiffs note how Managers were not permitted to allow other employees to exceed the number of working hours budgeted for the store and, if part-time or clerical employees could not complete the necessary work within the time allotted, the Manager was expected to perform the work without incurring overtime. According to Plaintiffs, often Managers could not complete the assigned work within the forty hours per week for which they were paid and consequently were expected to complete their work "off-the-clock", i.e., without incurring overtime. In order to recoup some of the unpaid time, Managers would make adjusting time entries through the POS system, a practice that was known and, in fact, recommended by GNC supervisors.

In support of their modest evidentiary burden at this stage, Plaintiffs proffer evidence indicating that the senior management of GNC (including both DVPs and DSDs) in two different Divisions covering Pennsylvania (the eastern half of which forms part of Division 1 and the western half forms part of Division 2) and North Carolina (a part of Division 2) regularly circulated reports regarding labor costs with particular emphasis on the issue of overtime wage expenses. Such reports identified persons who charged overtime, regardless of whether or not the overtime was either justified or had been approved in advance, by the individual's name,

store, and the amount of overtime they charged. *See* Doc. No. 79 at Rule 30(b)(6) Dep. (Vol. II) at Tr. pp. 258, 259 – 261, 262; and (Vol. III) 290, 291 – 294, 295, and Rule 30(b)(6) Dep. Ex. 37, 39, 40 & 41. These reports would routinely result in correspondence and directives from the respective DVPs regarding the overtime expenses. In an email directive dated April 14, 2010, Division 1 DVP Vincent Cacace instructed his DSDs to "Shut down the overtime both full and part time." *Id.* at Rule 30(b)(6) Dep. Ex. 39. DVP Cacace further directed that if actual wages for a manager's store exceeded the pre-approved budgeted hours for two consecutive pay periods, the manager was to be fired. *Id.* Similarly, after receiving an overtime report each month, Division 2 DVP Tom Braemer would routinely expect explanations from his RSDs for the use of overtime by their respective employees. *See* Doc. No. 70 at 30(b)(6) Dep. Ex. 51; Doc. No. 85, Poulin Dep. Ex. 10; Further, DVP Braemer also required that all overtime requests be approved in advance by both an RSD as well as the DSD. *See, e.g.*, Doc. No. 85, Poulin Dep. Exs. 10, 12, 14, and 26. As Plaintiffs note, within these communications, there is no effort to distinguish between authorized vs. unauthorized overtime expenses; the cause of such reactions from DVPs was simply the existence of overtime expense itself.

This tone was carried further as the messages were transmitted to the store Managers. The January 2009 Overtime Report was forwarded by Division 2 DSD Alan Wells to a group of RSDs wherein DSD Wells directed "The rule is that you have to approve OT and that I must then approve the OT … This is not happening and we will not have the most OT in the Division going forward … GET THIS UNDER CONTROL NOW." Doc. No. 86 at Scott Dep. Ex. 3 (emphasis original). Once again, there is no apparent distinction between authorized overtime as opposed to unauthorized. Similarly, the June 2008 Overtime Report was forwarded by Division 2 DSD Bruce Cantrell with the following admonition to his RSDs: "Wages are tight and must be

micromanaged by each of you. We all agreed to save 2 hours per store per Region and that did not happen in June why? … Bottom line manage your budget and stay within it period. I want explanations back on this by Friday am and I want to know what you are doing to control this." Doc. No. 86 at Scott Dep. Ex. 3 (email correspondence dated July 7, 2008). In response, the RSDs in Division 2 would react to such obligations with further limitations through email correspondence regarding overtime, including conveying that there is simply no overtime available at all. *See* Doc. No. 88, Wunschel Dep. Ex. 17 (RSD Suzan Glad email dated Feb. 6, 2008)("get the word out …. NO OVERTIME!!!!!!!!!! NOT SO MUCH AS 15 MINS!"); *see also*, Doc. No. 79 at 30(b)(6) Dep. Exs. 48 (RSD Mike Jeffers email dated May 17, 2010); 49 (RSD Jeffers email dated Feb. 15, 2010); 53 (RSD Thomas Slaughter email dated July 20, 2009) ("Manager get [sic] paid for 40, period.")

Defendants oppose the conditional certification of a collective class, and point to evidence within the record to rebut Plaintiffs' claims that potential opt-in plaintiffs are similarly situated. Defendants have proffered a number of the written employee policies that concern the issue of working off-the-clock. The GNC employee handbook is provided to each employee and is expected to be read and understood by each employee. *See* Doc. No. 61, Decl. of Jeffrey Emrick, at ex. A (excerpts from the GNC employee handbook). Defendants contend that GNC promulgates and enforces a policy that strictly prohibits any off-the-clock work. In relevant part, the GNC employee handbook includes the following:

> Payroll
>
> All time worked by associates must **ALWAYS** be recorded exactly as it has occurred. Work schedules are determined by management and must be flexible to ensure adequate store coverage at all times.
>
> 1. Each employee, regardless of position, is required to record his/her own actual hours worked as outlined in the Retail Operations Manual. Any misrepresentation of those hours actually worked is

> a serious violation and will result in disciplinary action, up to and including discharge from employment, as management deems appropriate.

*Id.* (emphasis original). Defendants points to this provision as one of several as evincing a company-wide edict that prohibits off-the-clock work. Notably, that same section of the GNC employee handbook somewhat qualifies the notion that employees are expected to freely report all hours worked with the following:

> 2. Employees may only work hours which are scheduled or otherwise authorized. Working extra time not scheduled or not specifically authorized or not occasioned by a bona fide emergency is a violation of policy.

*Id*. Defendants also promulgate an overtime compensation policy that requires approval of overtime to be worked by non-exempt employees, but also notes that "all [overtime] hours worked are to be reported regardless of prior approval." *Id*. at ex. B. In further support of this point, GNC promulgates a memorandum every year regarding wages that includes, *inter alia*, the following admonition, "If you are made aware of an employee who has worked off the clock, submit a Payroll Discrepancy for the number of hours the employee admits to working off the clock." Doc. No. 88 at Dep. Exs. 15 & 16.

Plaintiffs counter this point with evidence of RSDs and GNC Loss Prevention employees being aware of Managers and Assistant Managers deleting time from their time records in order to avoid being paid more than 40 hours per week, and yet taking no corrective action. *See* Doc. No. 88, Wunschel Dep. Exs. 8 (redacted statement from GNC employee identified as Employee no. 14 informing Regional Loss Prevention Manager ("RLPM") Alberto Pagan "I do know that I've worked many hours of overtime after clocking out to make GNC expectations happen."); 9 (email correspondence from Lori Barrett to RSD Tom Smith asking that he include a number of facts "such as the many hours I worked off the clock (which I have a record of) to accomplish

what was asked of me" during the course of her unemployment compensation proceeding); and 11 (letter from Bonnie H. Martin informing RSD Slaughter about "all of the hours I worked off the clocks in stores and at home on reports.") Apparently, no action was ever taken with any of these employees on the part of Defendants to correct the discrepancies of working off the clock.

Additionally, Defendants argue that different locations, managers, and factual situations are involved at each location that would require fact-intensive, individualized determinations unsuitable for collective treatment. Doc. No. 60 at 44 – 49. In support thereof, Defendants reference a number of other decisions by courts noting the lack of evidence of a company-wide illegal policy as a basis against conditional certification. *Id.* (*referencing, Basco v. Wal-Mart Stores, Inc.*, No. 00-3184, 2004 U.S.Dist. LEXIS 12441, 2004 WL 1497709 (E.D. La. 2004); *England v. New Century Financial Corp*., 370 F.Supp.2d 504, 511 (M.D. La. 2005); *Diaz v. Electronics Boutique of America, Inc.*, No. 04-cv-0840E(Sr), 2005 WL 2654270 at *4 (W.D.N.Y. 2005); and *West v. Border Foods, Inc*., No. 05-2525, 2006 WL 1892527 (D. Minn. 2006)). In *Basco*, the plaintiff proffered evidence that one manager required off-the-clock work; that five employees worked more than 40 hours without being paid overtime; and that managers received bonuses for keeping salary costs down, resulting in managerial incentive to encourage off-the-clock work. *Id.* at **19-20. The court found that "plaintiffs seek to make a corporate policy to keep employee wage costs low sufficient proof to justify the creation of a class of all Wal-Mart employees that have not been properly paid overtime in the last three years ... The effects of the policy as alleged are anecdotal, that is to say particularized." *Id.* at **21-22. That court, therefore, found that conditional certification should be denied. *Id.* at *22.

Within this Circuit, however, courts confronting such circumstances have granted conditional certification, and thus held the case over until the next stage of the certification

analysis. An unwritten policy or practice resulting in unpaid overtime, such as making management pay dependent upon meeting hours targets, may be actionable under the FLSA. *See, e.g., Burkhart-Deal v. CitiFinancial, Inc.*, No. 07-1747, 2010 WL 457127 (W.D. Pa. 2010); *see also, Pereira v. Foot Locker, Inc.*, No. 7-2157, 2009 U.S. Dist. LEXIS 84022, at ----17-18 (E.D.Pa. Sept. 11, 2009). In such cases, a defendant's claim or defense that individualized circumstances of employees render the matter unsuitable for collective treatment may be more appropriately reviewed during step two of the certification process. *Pereira* at *18; *see also Abercrombie v. Ridge*, No. 09-0468, 2009 U.S. Dist. LEXIS 102533, at ----15-16 (W.D.Pa. Sept. 22, 2009); *Stanislaw*, 2009 U.S. Dist. LEXIS 85056, 2009 WL 3030298. As Judge Ambrose observed in *Burkhart-Deal*, “collective actions have been conditionally certified in off-the-clock cases, and in cases with employees at various locations, and in cases where a defendants' written policies were commonly violated in practice.” *Burkhart-Deal*, at * 3 (*quoting Simmons v. T-Mobile USA, Inc.*, No. H-06-1820, 2007 U.S. Dist. LEXIS 5002, 2007 WL 210008 (S.D.Tex. 2007)).

Although Defendants argue that dissimilarities between potential opt-in plaintiffs are relevant to the issue of whether they are similarly situated, “at this preliminary stage of the case, these differences among proposed class members and the potential impact of FLSA exemptions do not undermine Plaintiff['s] modest factual showing,” *Scott v. Bimbo Bakeries, Inc.*, No. 10–3154, 2012 U.S. Dist. LEXIS 26106, at *37 (E.D.Pa. Feb. 29, 2012); *see also Burkhart–Deal*, at *9 (“[A] defendant's claim or defense that individualized circumstances of employees render the matter unsuitable for collective treatment may be more appropriately reviewed during step two of the certification process.”)

The Court finds that such an approach is appropriate here, especially in light of the factual showing proffered by Plaintiffs. Unlike those situations in which courts have found collective action to be inappropriate, Plaintiffs have adduced evidence of a *de facto* policy through their proffer of a number of records and correspondence that spans the breadth of company-wide authority, up to the DVP level, conveyed through the DSD level, and implemented by the RSDs. Plaintiffs have produced evidence sufficient for their showing at this stage to demonstrate Defendants' efforts to document overtime expenses, to individually identify those who accrue overtime expenses, to demand explanations for each use of overtime, to cast the use of overtime pejoratively with terms like "abuse" or "costing"[2] the company money, and to impose consequences for being over the allotted budget in the form of either written warnings or possible termination of employment for managers without regard to the question of whether overtime was necessary or not. Coupled with this is the evidence that supervisors are able to note the time entries for Managers and other employees that are subsequently adjusted, and those occasions discovered by Plaintiffs that RSDs were made aware of off-the-clock work with no action being taken to correct it. In a case involving a similar degree of notice by supervisors of off-the-clock work, the Court of Appeals for the Fifth Circuit explained:

> Because the immediate supervisors were primarily responsible for the employees' failing to report all overtime, we believe they may have had actual knowledge of the unreported overtime. At the very least, they had constructive knowledge, for they had the opportunity to get truthful overtime reports but opted to encourage artificially low reporting instead. The company cannot disclaim knowledge when certain segments of its management squelched truthful responses.

*Brennan v. General Motors Acceptance Corporation*, 482 F.2d 825, 828 (5th Cir. 1973).

2 In an email message sent to his RSDs following the receipt of the March 2010 overtime report, Division I DSD Vance Moore noted, "The 41 individuals that are highlighted in the attached spreadsheet cost us almost 6,000.00 in wages paid due to overtime." Doc. No. 79-40, 30(b)(6) Dep. Ex. 37.

In view of the factual showing proffered by Plaintiffs, the Court is persuaded that the modest burden for conditional certification has been met. While individualized variations may well exist in terms of the circumstances of different stores, Plaintiffs have demonstrated, at least in terms of the requisite showing appropriate at this stage, that an approach toward overtime instituted by DVPs, conveyed by DSDs, subsequently implemented by RSDs, and as applied to store Managers, had the effect of encouraging off-the-clock work through a tone of resistance to reported overtime (authorized or not), and that such an approach was ultimately translated to store Managers in the form of a prohibition of overtime in and of itself notwithstanding the written policies set forth in the employee handbook and elsewhere.

Accordingly, the Court will conditionally certify a collective action consisting of all present or former managers of Defendants General Nutrition Centers, Inc. and/or General Nutrition Corporation (collectively "GNC") in Division 1 and Division 2 of the GNC retail organizational structure who, during the three years prior to the commencement of this action to the present, may have been affected by the *de facto* policy against overtime alleged in the First Amended Complaint. The Court will not extend conditional certification of the collective class to include assistant store Managers and other non-exempt employees. There is a distinct difference between the store Managers and these other categories of employees, namely the responsibilities associated with setting the work schedule and subsequently approving the Final Payroll Report. According to the evidentiary showing proffered by Plaintiffs, it was the limitation imposed on store Managers to curtail overtime that collided with the other requirements of operating and maintaining each store and allegedly put the Managers in the untenable position of having to complete necessary duties off the clock.

B. Notice

In appropriate cases, district courts have the discretion to implement Section 216(b) by facilitating notice to potential plaintiffs. It is this Court's "managerial responsibility to oversee the joinder of additional parties to assure that the task is accomplished in an efficient and proper way." *Hoffman-La Roche Inc.*, 493 U.S. at 170-71. In this case, court-approved notice is appropriate. The parties will be directed to meet and confer to devise a fair and accurate notice and procedure that is reasonable and agreeable to the parties and the Court.

**Conclusion**

For the reasons hereinabove set forth, PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION, Doc. No. 53, will be granted in part and denied in part. An appropriate order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DOMINIC VARGAS, ANNE HICKOK** *on behalf of themselves and all others similarly situated*, **Plaintiffs,** | ) | **2:10-cv-867** |
| **v** | ) | |
| **GENERAL NUTRITION CENTERS, INC.** *A Delaware Corporation and* **GENERAL NUTRITION CORPORATION, Defendants.** | ) | |

**ORDER OF COURT**

AND NOW, this 16th day of August, 2012, in accordance with the foregoing Memorandum Opinion it is hereby ORDERED, ADJUDGED and DECREED that PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION, Doc. No. 53 is **GRANTED IN PART AND DENIED IN PART**, as more fully set forth in the foregoing Memorandum Opinion. A collective action is conditionally certified, comprised of:

> all present or former Managers of Defendants General Nutrition Centers, Inc. and/or General Nutrition Corporation (collectively "GNC") in Division 1 and Division 2 of the GNC retail organizational structure who, during the three years prior to the commencement of this action to the present, may have been affected by the de facto policy against overtime alleged in the First Amended Complaint.

Defendants shall provide to counsel for Plaintiffs and the Court a list of the name and last known address of all present and former Managers as above referenced for said relevant time period. The parties are further directed to confer and submit a joint proposed notice to be sent to all putative plaintiffs, or apprise the Court in writing of the specific reason(s) why they are unable to do so, on or before August 30, 2012.

IT IS FURTHER ORDERED that a status conference is scheduled before the undersigned on Thursday, September 6, 2012, at 1:30 P.M. The parties are to confer and be prepared to apprise the Court, during that conference, regarding areas of agreement and disagreement regarding substantive and chronological parameters of further discovery, and a schedule for motions and briefs regarding the second stage of certification.

BY THE COURT:

s/Terrence F. McVerry
United States District Judge

cc: **Adrian N. Roe, Esquire**
Email: aroe@roelawoffice.com
**Michael D. Simon, Esquire**
Email: MDSimon20@msn.com

**Gordon W. Schmidt, Esquire**
Email: gschmidt@mcguirewoods.com
**Brad A. Funari, Esquire**
Email: bfunari@mcguirewoods.com
**Christopher M. Michalik, Esquire**
Email: cmichalik@mcguirewoods.com